## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA

STEPHEN SHAFFER, INDIVIDUALLY :   CASE NO. 1:16-CV-2673
AND ON BEHALF OF ALL OTHERS :
SIMILARLY SITUATED :   **COMPLAINT**
  :
      *PLAINTIFF*, :   **CIVIL ACTION**
  :
V. :   **JURY TRIAL DEMANDED**
  :
  :
CAPITAL UNIVERSITY BOARD OF :
TRUSTEES, THE OHIO ATHLETIC :
CONFERENCE, AND THE NATIONAL :
COLLEGIATE ATHLETIC :
ASSOCIATION :
  :
      *DEFENDANTS*. :

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Stephen Shaffer brings this Class Action Complaint and Demand for Jury Trial against the above-captioned Defendants, including the Capital University Board of Trustees ("Capital University"), the Ohio Athletic Conference, ("OAC"), and the National Collegiate Athletic Association ("NCAA") (collectively, "Defendants"), to obtain redress for all persons injured by Defendants' reckless disregard for the health and safety of generations of Capital University student-athletes. Plaintiff alleges as follows upon personal knowledge as to himself and his own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by his attorneys.

## INTRODUCTION

1.     Nearly one-hundred thousand student-athletes participate in NCAA football each year as a part of "America's sport," which draws millions of Americans as

enthusiastic patrons every week during the season. On game days, hundreds of thousands of fans fill college football stadiums around the country, while millions more view the games on television or over the Internet. Indeed, whole days of every week are given over to these contests in hundreds of cities and towns around the country. Plaintiff and the Class of once-young, impressionable, and eager-to-please players he represents were motivated by Capital University, the OAC, and the NCAA to strive for excellence by doing "whatever it takes" on the football field.

2. For decades, the NCAA football program has served as a training ground for the National Football League ("NFL"), operating as a sports enterprise that closely resembles a professional sports league—particularly in terms of the NCAA's lucrative broadcast contracts and other sundry sources of revenue, which have all accrued to the direct pecuniary benefit of the NCAA, the OAC, and Capital University.

3. Despite decades of foreknowledge, Defendants have concealed from both student-athletes and the general public the deleterious effects of football's endemic medical touchstones: head trauma, concussions, and neurological injuries. Specifically, Defendants have known about, and actively concealed, an epidemic of football-related trauma and illnesses that is debilitating and killing thousands of former NCAA student-athletes.

4. During the course of the NCAA football season, student-athletes may be exposed to more than 1,000 impacts exceeding 10 units of gravitational force ("g's"), with the majority of football-related impacts to student-athlete's heads exceeding 20 g's, and some impacts registering near 100 g's. To put these numbers in the proper context, an unsecured front-seat passenger in a vehicle travelling 25 m.ph. that strikes a wall

would experience an impact force of approximately 100 g's. Therefore, cumulatively, thousands of NCAA student-athletes are being subjected to head trauma that is the equivalent of several hundred car accidents every football season.

5. These repetitive and violent impacts have caused Capital University student-athletes to suffer repeated head trauma, and significantly increased their risk for long-term neurological injuries, including: memory loss, dementia, depression, Chronic Traumatic Encephalopathy ("CTE"), Alzheimer's disease, Parkinson's disease, other neurocognitive disorders/injuries, and related symptoms. This means that Plaintiff and the other members of the Class continue to suffer the devastating neurological effects of their on-field injuries, despite the fact that their football careers have long-since come to a close.

6. Unfortunately, Defendants have known about the debilitative, long-term dangers associated with concussions, concussion-related injuries, and sub-concussive injuries (referred to, collectively, as "traumatic brain injuries" or "TBIs") that result from playing college football. Specifically, a vast and thorough body of scientific research has described and established the inherent dangers posed by TBIs for decades. Defendants actively and knowingly concealed this information to protect the multi-billion dollar business of "amateur" college football.[1]

7. While Plaintiff and the other members of the Class were in-school and participating in the NCAA's athletic program, they were under Defendants' direct care and supervision. Yet, despite undertaking clear obligations to: (1) provide a safe athletic environment; and (2) safeguard the well-being of student-athletes, Defendants did not

---

[1]  *See, e.g., NCAA Finances*, USA TODAY, *available at* http://sports.usatoday.com/ncaa/finances (last visited Oct. 6, 2016).

implement adequate procedures and protocols to guard against TBIs, and the resulting neurological disorders and injuries that will affect these former student-athletes for the rest of their lives.

8.     As a direct result of Defendants' actions, omissions, and deliberate concealment, Plaintiff and the Class of former student-athletes (defined below) now suffer from various neurological and cognitive medical ailments, including, but not limited to: memory loss, dementia, depression, CTE, Alzheimer's disease, Parkinson's disease, other neurocognitive disorders/injuries, and related symptoms.

### THE PARTIES

9.     Plaintiff, Stephen Shaffer, is an adult male and a citizen of the State of Ohio, residing at 2525 Serenity Lane, Uniontown, Ohio 44685.  Plaintiff played NCAA Division III football at Capital University for three (3) seasons, from 1990-1993.

10.     Defendant Capital University Board of Trustees is a private, coeducational university with its principal office located at 1 College and Main, Columbus, Ohio 43209-7812.  Capital University is a tax-exempt organization under Section 501(c)(3) of the U.S. Internal Revenue Code, and is not organized under the laws of any State.  As such, Capital University is a citizen of the State of Ohio pursuant to 28 U.S.C. § 1332(d)(10).  Capital University regularly conducts business throughout the State of Ohio and the United States.

11.     Defendant Ohio Athletic Conference is an unincorporated athletic association, with its principal offices located at 4490 Mahoning Avenue, Suite C, Austintown, Ohio 44515.  The OAC is an NCAA-affiliated conference, which competes in Division III athletics (including football).  The OAC is a tax-exempt organization under

Section 501(c)(3) of the U.S. Internal Revenue Code, and is not organized under the laws of any State. As such, the OAC is a citizen of the State of Ohio pursuant to 28 U.S.C. § 1332(d)(10). The OAC regularly conducts business throughout the State of Ohio and the United States.

12. Defendant National Collegiate Athletic Association is an unincorporated association with its principal office located at 700 West Washington Street, Indianapolis, Indiana. The NCAA represents itself as a tax-exempt organization under Section 501(c)(3) of the U.S. Internal Revenue Code. The NCAA is not organized under the laws of any State. As such, the NCAA is a citizen of the State of Indiana pursuant to 28 U.S.C. § 1332(d)(10). The NCAA regularly conducts business throughout this District, the State of Indiana, and the United States.

### JURISDICTION AND VENUE

13. This Honorable Court has subject matter jurisdiction over this case under 28 U.S.C. § 1332(d)(2) because: (1) at least one member of the Class—which consists of at least 100 members—is a citizen of a state different from Defendants; (2) the amount in controversy exceeds $5,000,000, exclusive of interest and costs; and (3) none of the exceptions enumerated under that subsection apply to this action.

14. This Honorable Court has personal jurisdiction over Defendants because they conduct significant business in this District, including establishing consumer and business contracts, and because the unlawful conduct alleged in this Class Action Complaint occurred in, was directed at, and/or emanated in part from this District.

15.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the Plaintiff's claims occurred in and/or emanated from this District and because the NCAA resides in this District.

## FACTUAL BACKGROUND

### I.     Defendants Had a Duty to Protect Student-Athletes

16.     The NCAA is the governing body of collegiate athletics, overseeing 23 college sports and over 400,000 participating student-athletes, including the Capital University football program and the OAC's related conference programming.  According to the NCAA, "[m]ore than 1,200 schools, conferences, and affiliate organizations collectively invest in improving the experiences of student-athletes—on the field, in the classroom, and in life."[2]

17.     To accommodate the wide spectrum of student-athletes at its member institutions, the NCAA has three different "divisions" of intercollegiate athletic competition.  Division I is the highest level of intercollegiate athletes sanctioned by the NCAA and includes many well-known universities, with high-ranking teams, larger operating budgets, better athletic facilities, and greater scholarship endowments.[3] However, Division II and Division III schools account for a lion's share of the actual

---

[2]     *Membership*, NATIONAL COLLEGIATE ATHLETIC ASSOCIATION (May 17, 2016), *available at* http://www.ncaa.org/about/who-we-are/membership.

[3]     NCAA athletics actually organize Division I into "Division I-A" and "Division I-AA" based on various attendance and financial aid requirements that are not directly relevant to this cause of action at this time.  Division II and Division III schools also operate under NCAA-imposed requirements related to the number of sponsored sports at an institution, financial aid limits, and athletic scheduling.  *See, e.g.*, *Divisional Differences and the History of Multidivisional Classification*, NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, *available at* http:// http://www.ncaa.org/about/who-we-are/membership/divisional-differences-and-history-multidivision-classification (last visited Oct. 4, 2016).

collegiate athletics programs, with over four times as many participating member institutions as Division I.[4]

18.     Each NCAA Division is composed of several "conferences" to facilitate regional league play, including the the OAC.  The OAC was founded in 1902 to address the "numerous problems" already plaguing college athletics at the turn of the Twentieth Century, including immediate concerns related to "massive football injuries."[5] Currently, the OAC has ten (10) member institutions, all within the State of Ohio.

19.     Capital University joined the OAC in 1927, and remains a member institution of the conference to the present day.

20.     In conjunction with the NCAA and the school itself, the OAC is responsible for overseeing the Capital University football program.  In furtherance of its NCAA commitments and obligations, the OAC promulgates rules, handbooks, and regulations governing the respective athletics departments of its member institutions, including Capital University.  Accordingly, each constituent member institution (including Capital University)—and each of those institutions' student-athletes—agreed to abide by the rules and regulations issued by the NCAA and the OAC.

21.     When it was originally founded as the Intercollegiate Association of the United States ("IAAUS"), the NCAA was lauded as "dedicated to safeguarding the well-

---

[4]     Specifically, there are 128 Division I schools, while approximately 613 schools participate as members of Division II and Division III athletics.

[5]     *History*, OHIO ATHLETIC CONFERENCE, *available at* http://www.oac.org/information/History/OAC_HISTORY_2012__3_.pdf (last visited Oct. 5, 2016).

being of student-athletes and equipping them with the skills to succeed on the playing field, in the classroom and through life."[6]

22.     In fact, the IAAUS—renamed in 1910—was created at the behest of U.S. President Theodore Roosevelt, who convened a group of university professors and athletic coaches to discuss the alarming rates of deaths and injuries resulting from college football contests.[7]  Even at its inception, the NCAA's singular stated objective was the promotion of student-athlete safety and well-being.  That mission clearly continues today, as the NCAA continues to claim that it is "dedicated to safeguarding the well-being of student-athletes and equipping them with the skills to succeed on the playing field, in the classroom[,] and throughout life."[8]

23.     Moreover, as the NCAA makes clear in its communications regarding membership, the overseeing of collegiate athletics is a cooperative and all-inclusive task that is spread amongst many different pedagogical agents: "College and university presidents and chancellors guide each division, supported by an extensive committee structure guided by athletic administrators, faculty[,] and student-athlete representatives . . . [thereby, each] division creates its own rules that follow the overarching principles of the NCAA."[9]

---

[6]     *About the NCAA*, NATIONAL COLLEGIATE ATHLETIC ASSOCIATION (May 17, 2016), *available at* http://www.ncaa.org/about (last visited Sept. 29, 2016).

[7]     *See, e.g.*, *Formation of the NCAA: An Unexpected Beginning*, NATIONAL COLLEGIATE ATHLETIC ASSOCIATION (Nov. 21, 2012), *available at* http://ncaahistoryguide.com/formation-ncaa-unexpected-beginning/#more-52.

[8]     *About the NCAA*, NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, http://www.ncaa.org/about (last visited Oct. 4, 2016).

[9]     *Membership*, NATIONAL COLLEGIATE ATHLETIC ASSOCIATION (May 17, 2016), *available at* http://www.ncaa.org/about/who-we-are/membership.

24.     Therefore, collectively, Defendants govern and regulate the Capital University football program and owe a duty of care to the student-athletes under their supervision and authority.

25.     The "overarching principles" of the NCAA—not least of all its commitment to safeguarding the health and well-being of student-athletes—are enshrined in the NCAA Constitution, which states, in relevant part, as follows:

The purposes of this Association are:

(a) To initiate, stimulate and improve intercollegiate athletics programs for student-athletes;

(b) To uphold the principal of **institutional control of, and responsibility for**, all intercollegiate sports in conformity with the constitution and bylaws of this [A]ssociation . . . .

NCAA Constitution, Art. 1, §§ 1.2(a)-(b) (emphasis added).

26.     Pursuant to its "Fundamental Policies," the NCAA Constitution also states that "[m]ember institutions shall be obligated to apply and enforce this legislation, and the enforcement procedures of the [NCAA] shall be applied to an institution when it fails to fulfill its obligation."  NCAA Constitution, Art. 1, § 1.3.2.

27.     Article 2.2 of the NCAA Constitution ("The Principle of Student-Athlete Well-Being") is highly instructive to the instant controversy and provides that "[i]ntercollegiate athletics programs shall be conducted in a manner designed to protect and enhance the physical and educational well-being of student[-]athletes."

28.     Furthermore, Article 2.2.3 of the NCAA Constitution ("Health and Safety") unequivocally states that "[i]t is the responsibility of each member institution to protect the health of, and provide a safe environment for, each of its participating student[-]athletes."

9

29.     To these ends, the NCAA devises and maintains standard athletic regulations and requirements that govern and bind its member institutions, including, but not limited, the NCAA Constitution, the NCAA Operating Bylaws, the NCAA Administrative Bylaws, and the relevant NCAA Division Manuals.  These documents provide guidance on game rules, student-athlete eligibility, scholarship parameters, and institutional obligations regarding the well-being and safety of student-athletes:

> Each institution shall comply with all applicable rules and regulations of the [NCAA] in the conduct of its intercollegiate athletics programs . . . .  Members of an institution's staff, student-athletes, and other individuals and groups representing the institution's athletic interests shall comply with the applicable [NCAA] rules, and the member institution shall be responsible for such compliance.

NCAA Constitution, Art. 2, § 2.8.1.

30.     In addition to the documents described above, the NCAA also publishes annual guidelines regarding student-athlete health and safety in the Sports Medicine Handbook ("the Handbook").  The Handbook includes the NCAA's official policies for the prevention and treatment of sports-related injuries, as well as parameters regarding when injured student-athletes may resume participation in athletics following an injury. The Handbook unequivocally recognizes that "student-athletes rightfully assume that those who sponsor intercollegiate athletics have taken reasonable precautions to minimize the risk of injury from athletics participation."[10]

31.     In addition to setting forth minimum compliance requirements for its member institutions, the NCAA Constitution also promises to directly aid member institutions in their ongoing compliance efforts:  "[The NCAA] shall assist the institution

---

[10]     *See*, *e.g.*, David Klosser, *2013-14 NCAA Sports Medicine Handbook*, NATIONAL COLLEGIATE ATHLETIC ASSOCIATION (Aug. 2013), *available at* https://www.ncaa.org/sites/default/files/2013-14%20Sports%20Medicine%20Handbook.pdf.

in its efforts to achieve full compliance with all rules and regulations." *See*, *e.g.*, NCAA Constitution, Art. 2, § 2.8.2.

32.     Beyond individual academic institutions, the NCAA Constitution also contemplates and addresses the rights and responsibilities of intercollegiate athletics conferences, which are entitled to all of the privileges of active member institutions (save the right to compete in NCAA championships). *See*, *e.g.*, NCAA Constitution, Art. 3, § 3.02.3.2. Furthermore, "conferences of the [NCAA] agree to administer their athletics programs in accordance with the constitution, bylaws[,] and other legislation of the [NCAA]." NCAA Constitution, Art. 3, § 3.3.4.

33.     Therefore, the NCAA holds itself out as a proponent of, authority regarding, and regulatory institution overseeing the prevention and treatment of sports-related injuries affecting student-athletes. In particular, the NCAA's governing documents indicate that its member institutions—including Capital University and the OAC—rely upon the NCAA for guidance and support on issues of student-athlete safety and well-being, including the treatment of injuries sustained by NCAA student-athletes.

34.     As a member institution of the NCAA, Capital University agreed to abide by, amongst other documents, the NCAA Constitution, and is otherwise obligated to safeguard the health and safety of its student-athletes, including Plaintiff and the other members of the Class. *See*, *e.g.*, NCAA Constitution, Art. 2, § 2.8.1.

35.     As a member conference of the NCAA and the athletic conference administering Capital University's football program, the OAC is similarly charged with implementing and enforcing NCAA guidelines to meaningfully protect the health and

safety of Capital University football players, including Plaintiff and the other members of the Class.  *See*, *e.g.*, NCAA Constitution, Art. 3, §§ 3.02.3.2, 3.3.4.

36.     When compared to Plaintiff and the other members of the Class, Defendants were respectively in superior positions to know about, recognize, and mitigate the risks of TBIs.

## II.     Decades of Medical Research has Unequivocally Established the Dangers Associated with Football-Related TBIs

37.     Numerous medical studies have firmly established that repetitive trauma to the head can result in TBIs, and are associated with heightened risks of long-term neurological disorders and illnesses, including, but not limited to: memory loss, dementia, depression, CTE, Alzheimer's disease, Parkinson's disease, other neurocognitive disorders/illnesses, and related symptoms.  To better understand the nature of this substantial body of research, a brief review of the material follows:

### A.     *An Overview of Football-Related TBIs*

38.     A "concussion" is defined as a TBI caused by a person's head moving rapidly.  This movement causes the brain to bounce and twist inside of the skull, which can damage the brain, primarily, and also catalyze chemical changes in the brain.

39.     Typically, the brain is cushioned by the presence of spinal fluid between the soft brain tissue and the rigid bone of the skull.  This layer of spinal fluid is enough to prevent the brain from impacting the skull during "everyday" movements.  But, even relatively minor impacts—including indirect impacts that do not directly strike the head, such as those that produce a "whiplash" effect in the neck—can produce sufficient brain movement to breach the permeable barrier of the spinal fluid and cause the brain to

12

"knock" against the skull. These types of intracranial impacts produce concussions and other TBIs.

40.     Concussions typically occur when linear and rotational accelerations impact the brain through direct impacts to the head, or through indirect "whiplash" impacts. As aforementioned, student-athletes playing a full season of football can expect to receive more than 1,000 impacts exceeding 10 g's (or, slightly more gravitational force than that experienced by fighter pilots executing "maximal" maneuvers). However, the majority of football-related impacts **exceed** 20 g's.

41.     Dr. Kevin Guskiewicz, of the University of North Carolina's Sports Concussion Research Program, compared the impacts sustained in a routine football practice to crashing a car: "If you drove your car into a wall at twenty-five miles per hour and you weren't wearing your seat belt, the force of your head hitting the windshield would be around 100 [g's]: in effect, [a player who sustained two hits about 80 g's], had two car accidents that morning."[11]

        i.     *TBI Symptoms*.

42.     Following a severe impact, student-athletes may begin exhibiting TBI symptoms, including, but not limited to:

- feeling dazed, dizzy, or lightheaded (*i.e.*, "seeing stars");

- memory loss, including short-term memory loss and retrograde amnesia;

- nausea and/or vomiting;

- headaches;

---

[11]     Malcolm Gladwell, *Offensive Play*, THE NEW YORKER (Oct. 19, 2009), *available at* http://http://www.newyorker.com/magazine/2009/10/19/offensive-play.

- blurred vision and light sensitivity;

- slurred speech, or difficulty communicating lucidly;

- difficulty concentrating, thinking, or making decisions;

- diminished coordination and balance (including hand-eye coordination, such as being unable to catch a thrown ball);

- anxiety and irritability; and/or

- exhaustion.

43.     Student-athletes may not be able to immediately recognize the symptoms of a TBI (or, worse yet, the symptoms themselves may interfere with their ability to evaluate and recognize these life-threatening problems), which creates the likelihood of further, more-serious injury.  To wit, student-athletes who return to active athletic participation before they have adequately healed from previous TBIs place themselves at ever-increasing risks of seriously compounding their injuries.

ii.     _Medical Treatment of TBIs_

44.     After suffering a TBI (such as a concussion), a student-athlete's brain requires significant time to heal.  Doctors generally prohibit such individuals from returning to "normal" activities—up to, and certainly including, full-contact sports— until all TBI-related symptoms have ceased because an already injured brain is particularly vulnerable to further trauma.

45.     The time required for such healing varies from person to person, and from injury to injury, with TBI-related symptoms sometimes persisting for weeks at a time.

46.     Individuals who fail to recover from TBIs within a few weeks are diagnosed as suffering from "post-concussion syndrome."  Those diagnosed with post-

14

concussion syndrome are typically referred to medical specialists to address their symptoms, which can last for months, years, or become permanent.

47.     As such, TBIs constitute a cumulative, long-term, and debilitating medical problem in many circumstances.

B.     *The Long-Term Dangers of TBIs are Well-Documented*

48.     The two leading studies examining the long-term effects of TBIs were conducted at Boston University's Center for the Study of Traumatic Encephalopathy and the Brain Injury Research Institute (located near Pittsburgh, PA). These studies enumerate the "devastating consequences" of repeated TBIs, including increased risks of depression, dementia, suicide, and a host of other medical problems. The studies have also demonstrated that repeated TBIs trigger the progressive degeneration of brain tissue, including the build-up of an abnormal protein ("tau").

49.     Between 2002 and 2007, Dr. Bennett Omalu of the Brain Injury Research Institute examined the brains of five former NFL athletes: Andre Waters, Mike Webster, Terry Long, Justin Strzelcyyk, and Damien Nash. Four of these players died under tragic and strange circumstances: Waters and Nash committed suicide, Webster died of heart failure while homeless and cognitively impaired, and Strzelcyyk died in a car accident that resulted from him driving the wrong way down a highway at 90 m.p.h. Four of the five brains were found to have telltale signs of CTE, which is a progressive degenerative disease of the brain affecting people with histories of repetitive TBIs.

50.     Dr. Robert Cantu, of the Boston University Center for the Study of Traumatic Encephalopathy, has found evidence of CTE in 96 percent of the autopsies performed on the brains of former NFL players (90 out of 94 subjects). Furthermore,

Dr. Cantu has found evidence of CTE in 79 percent of the autopsies performed on the brains of all former football players (regardless of the level of the sport that they may have played while alive).

51.     Reaching similar conclusions, Dr. Omalu asserts that more than 90 percent of former NFL players suffer from some form of CTE.

52.     Unfortunately, medical studies similar to the ones produced by Drs. Omalu and Cantu date back to the early Twentieth Century.  Beginning with studies examining boxing-related TBIs during the 1920's, medical science has long-recognized the debilitating effects of TBIs on athletes.  That repetitive head trauma and TBIs cause permanent brain damage and produce increased risks of long-term neurocognitive disorders has been well-established for nearly a century.

53.     For example, Dr. Harrison S. Martland produced and published a study titled "Punch Drunk" in the *Journal of the American Medical Association* in 1928 describing the spectrum of clinical abnormalities observed in some 50 percent of boxers who had suffered a considerable impact to the head (or been knocked out).[12]  .

54.     Numerous later studies confirmed Martland's initial findings, which established that boxers who had suffered TBIs displayed signs of dementia, motor function impairment, and a "Parkinsonian" pattern of progressive neurological decline.[13]

---

[12]     *See*, *e.g.*, Dr. Harrison S. Martland, *Punch Drunk*, 91 J. AM. MED. ASS'N 1103 (1928)

[13]     *See*, *e.g.*, Drs. Ewald W. Busse & Albert J. Silverman, *Electroencephalographic Changes in Professional Boxers*, 149 J. AM. MED. ASS'N 1522, 1522 (1952) ("[T]he mild psychic changes observed in a high percentage of boxers . . . are due to brain damage, which is also responsible for the less frequently seen, so-called 'punch-drunk' person, who is in fact in a state of traumatic dementia and reveals severe psychic and neurological abnormalities."); M. Sercl & O. Jaros, *The mechanisms of cerebral concussion in boxing and their consequences*, 3 WORLD NEUROL 351, 351-58 (May 1962); C. Mawdsley & F.R. Ferguson, *Neurological Diseases in Boxers*, 282 LANCET 7312, at 795-801 (Oct. 19, 1963); C.J. Bruton, J.A.N.

16

55.     Dovetailing with these growing concerns over TBIs and their effects on athletes, at its 17th Annual Meeting in December 1937, the American Football Coaches Association decried the prevalent practice of permitting concussed student-athletes to continue to participate in athletics, and urged officials to prevent athletes from participating in contact sports after suffering even a single concussion.[14]

56.     Thereafter, in 1952, an article in the *New England Journal of Medicine* recommended a "three-strike rule" for concussions in football, whereby athletes would be required to cease playing football, **permanently**, after receiving three concussions.[15]

57.     In 1967, Drs. John R. Hughes and D. Eugene Hendrix published a study indicating that severe impacts negatively affected brain activity in football by monitoring the effects with electroencephalograms ("EEGs"), in real time.[16]

58.     These studies, along with many, many other pieces of accepted scholarly medical research, have warned of the dangers of TBIs, and collectively establish that:

- repetitive head trauma in contact sports, including football, carries the potential for devastating, long-term negative effects on neurological function;

- encephalopathy ("*dementia pugilistica*") is caused by repeated sub-concussive and concussive blows to the head;

---

Corsellis, & Dorothy Freeman-Browne, *The aftermath of boxing*, 3 PSYCHOLOGICAL MEDICINE 3, at 270-303 (August 1973).

[14]     Floyd R. Eastwood, *Seventh Annual Report on Football Injuries and Fatalities*, PROCEEDINGS OF THE SEVENTEENTH ANNUAL MEETING OF THE AMERICAN FOOTBALL COACHES ASSOCIATION (Dec. 29, 1937), at 25 ("During the past seven years the practice has been too prevalent of allowing players to continue playing after a concussion. Again this year this is true . . . . **Sports demanding personal contact should be eliminated after an individual has suffered one concussion**." (emphasis added))

[15]     *See*, *e.g.*, Dr. Augustus Thorndike, *Serious Recurrent Injuries of Athletes—Contraindications to Further Competitive Participation*, 247 NEW ENG. J. MED. 554, 555-56 (1952).

[16]     *See*, *e.g.*, Drs. John R. Hughes & D. Eugene Hendrix, *Telemetered EEG from a Football Player in Action*, ELECTROENCEPHALOGRAPHY & CLINICAL NEUROPHYSIOLOGY 24:183-86 (1967).

- acceleration and rapid deceleration of the head that results in a brief loss of consciousness results in tearing of the axons (*i.e.*, cells) of the brain stem;

- there is a direct relationship between an athlete's neurological pathology and the length of his career in contact sports;

- concussions cause immediate retrograde memory issues;

- TBIs require recovery time without the risk of re-injury or complications;

- football players suffering from concussions require significant rest before being subjected to further potential trauma; and,

- even minor head trauma can lead to neuropathological and neurophysiological alterations, including: (1) neuronal damage, (2) reduced cerebral blood flow, (3) altered brainstem evoked potentials, and (4) reduced information-processing speeds.

59.     These early studies offered numerous recommended changes to accommodate TBIs and concussion-related illnesses, safely, within the game of football, as did the studies that followed, which built off of this initial body of work.[17]

60.     Recently, the pace and scope of this research has intensified in response to the growing epidemic of former athletes suffering from symptoms. Beginning in 1991, Dr. Cantu, the American Academy of Neurology, and the Colorado Medical Society developed and issued "return-to-play" criteria for athletes suspected of having suffered TBIs while playing football. These guidelines were further revised in 2001 in response to the growing field of research related to football TBIs.

---

[17]     *See*, *e.g.*, Richard C. Schneider, *Head and Neck Injuries in Football: Mechanisms, Treatment, and Prevention*, (1st ed. 1973); D. Gronwall & P. Wrightson, *Cumulative effect of concussion*, 2 LANCET 7943, at 995-97 (Nov. 22, 1975) (concluding that non-athletes who received multiple TBIs suffered cumulative psychological effects, and extrapolating those effects to athletes); Arthur L. Benton, Howard M. Eisenberg, & Harvey S. Levin, *The University of Virginia Prospective Study of Mild Head Injury in Football*, *in* MILD HEAD INJURY, at 265-72 (1st ed. 1989) (review of 1982 study examining 2,350 players at ten different universities to establish a baseline with regard to the effects of TBIs on student-athletes).

61. A pair of NCAA-specific studies published in 2003 concluded that NCAA football student-athletes whom have previously sustained a TBI are more likely to suffer future TBIs, and also began to truly identify the complex nature of these injuries.[18]

62. A conference of neurological experts gathered in Prague in 2004 and provided recommendations for athletes suffering TBIs and concussive injuries in football, ice hockey, rugby, and other sports based on the research and best practices available at the time. Overall, the experts recommended a policy of refusing to allow symptomatic players to return to the field, coining the phrase: "When in doubt, sit them out."[19]

63. Thereafter, between 2005 and 2007, the University of North Carolina's Center for the Study of Retired Athletes published a series of survey-styled papers demonstrating the strong correlations between depression, dementia, early-onset Alzheimer's disease, and other forms of cognitive impairment suffered by former NFL players and the number of TBIs those players suffered during their careers.[20]

---

[18] *See*, *e.g.*, Michael McCrea, *et al.*, *Acute Effects and Recovery Time Following Concussion in Collegiate Football Players, the NCAA Concussion Study*, J. AM. MED. ASS'N (Nov. 19, 2003) (stating that student-athletes suffering from TBIs "may require several days for recovery of symptoms, cognitive dysfunction, and postural instability after [a TBI]," which are "followed by a complex cascade of ionic, metabolic, and physiological events that can adversely affect cerebral function for several days to weeks.").

[19] *See*, *e.g.*, Paul McCrory, *et al.*, *Summary and agreement statement of the 2nd International Conference on Concussion in Sport, Prague 2004*, BRITISH J. SPORTS MED., 39:196-204 (2005), *available at* http://bjsm.bmj.com/content/39/4/196.full. These findings echoed, and built upon, the initial round of medical protocols established by a similar convention in 2001. *See*, *e.g.*, *Summary and agreement of the First International Conference on Concussion in Sport, Vienna 2001. Recommendations for the improvement of safety and health of athletes who may suffer concussive injuries*, BRITISH J. SPORTS MED., 36(1):6-10 (Feb. 2002), *available at* http://bjsm.bmj.com/content/36/1/6.long. These conferences were attended, principally, by American doctors specializing in the neurological fields of medical practice.

[20] Alan Schwarz, *Concussions Tied to Depression in Ex-NFL Players*, THE NEW YORK TIMES (May 31, 2007), *available at* http://http://www.nytimes.com/2007/05/31/sports/football/31concussions.html.

64.     While Defendants knew for decades of the harmful effects of TBIs upon student-athletes, they ignored these facts and failed to institute meaningful responses and policies to warn and/or protect the student-athletes, including Plaintiff and the other members of the Class.  For Defendants, the continued expansion and lucrative operations of "amateur" NCAA football were simply too profitable to risk.

III.    **Defendants Breached Their Duties to Student-Athletes by Concealing the Dangers of TBIs and Refusing to Implement Reasonable Management Protocols.**

65.     Despite having full knowledge regarding the devastating, long-term effects and risks associated with TBIs sustained by and while playing, and/or practicing for, college football, Defendants actively concealed these risks (including, but not limited to: memory loss, dementia, depression, Chronic Traumatic Encephalopathy ("CTE"), Alzheimer's disease, Parkinson's disease, other neurocognitive disorders/injuries, and related symptoms) from its student-athletes and the general public.

66.     Upon information and belief, during every decade referenced above, Defendants were advised by physicians, researchers, and scientists concerning the severe, long-term medical risks associated with playing college football, including TBIs.

67.     Rather than fully apprising Capital University student-athletes of the danger, or implementing protocols to safeguard and protect their student-athletes from TBIs (as promised through the binding terms of several governing documents, including, but not limited to, the NCAA Constitution), Defendants failed to adopt the internationally accepted guidelines and "return-to-play" parameters described in the voluminous body of research sampled and described above until 2010.

68.     In flagrant disregard for this vast body of known and vetted scientific guidance, and in derogation of the authority vested in them by the agreed-to precepts governing NCAA athletics, Defendants designed and orchestrated policies regarding football practices and games that:

- ignored the medical risks to Plaintiff and the members of the Class;

- aggravated the medical risks to Plaintiff and the members of the Class;

- failed to apprise Plaintiff and the members of the Class concerning the demonstrated links between TBIs sustained playing football and the aforementioned neurological illnesses and conditions;

- failed to implement or enforce a reasonable system to prevent or mitigate the harms suffered by Plaintiff and the members of the Class; and,

- failed timely to implement "return-to-play" protocols and other internationally accepted norms related to TBIs suffered while playing sports.

69.     Indeed, the NCAA failed to acknowledge the dangers of TBIs in the Handbook until 1994, when a section captioned "Guideline 20: "Concussions and Second Impact Syndrome" ("Guideline 20") was added.    However, rather than mandating best practices for its member institutions, as required by its governing documents emphasizing the principle of "institutional control," Guideline 20 left the management of TBIs to the discretion of individual institutions.

70.     For example, while the 1998–99 version of Guideline 20 reported that "[c]oncussion and the resulting potential complications, such as second-impact syndrome, are potentially life-threatening situations that student-athletes may suffer as a result of their athletics participation," it also provided that the NCAA "does not endorse any specific concussion grading scale or return-to-play criteria."

71.     In this way, Guideline 20 was an attempt by the NCAA to disclaim liability, while shirking its obligations to safeguard the well-being of student-athletes, and to oversee the athletics programs administered by the OAC and Capital University.

72.     Despite having **<u>actual knowledge</u>** of the dangers of TBIs, the NCAA refused to implement, endorse, or even recommend specific best practicesor TBI-related safety measures to the OAC or o Capital University, such as a concussion grading scale or return-to-play criteria.

73.     The inadequacy of Guideline 20 was aggravated and exacerbated by Defendants' collective and individual failures to adopt or implement any meaningful safety measures, or TBI-specific protocols.

74.     Moreover, Defendants failed to comply with, or enforce, Guideline 20's explicit requirement that "[a] student athlete rendered unconscious for any period of time should not be permitted to return to the practice or game in which the head injury occurred.   In addition, no student-athlete should be allowed to return to athletics activity while symptomatic."

75.     Ultimately, until 2010, Defendants collectively and/or individually:

- failed to implement guidelines to prevent repeated TBIs;

- failed to educate student-athletes about the increased risk of TBIs in football;

- compelled and coerced Plaintiff and the other members of the Class to ignore TBI-related symptoms and continue to play football without allowing adequate time for student-athletes to heal from TBIs;

- failed to contact Plaintiff and the other members of the Class after they left school to inform them that they had been exposed to an increased risk of long-term neurocognitive disorders through the TBIs they sustained while playing football;

- failed to recommend or enforce "return-to-play" protocols; and/or

- failed to conduct a football program that proactively rewarded Plaintiff and the other members of the Class for receiving and inflicting TBIs.

76.    Moreover, Capital University student-athletes, including Plaintiff and the other members of the class, sustained TBIs—and inflicted TBIs on other players—for the purpose of advancing Capital University's football program by winning games, thereby accruing favorable publicity to Defendants, and generating millions of dollars in revenue for Defendants.

77.    It was not until April 2010, under mounting public pressure and negative publicity, that the NCAA finally made definitive changes to its concussion treatment protocols by adopting legislation requiring all of its member institutions to have a Concussion Management Plan ("CMP") in place for all sports.

78.    Under this new NCAA concussion policy, member institutions were required to have a CMP on file "such that a student-athlete who exhibits signs, symptoms, or behaviors consistent with a concussion shall be removed from practice or competition and evaluated by an athletics healthcare provider with experience in the evaluation and management of concussions."

79.    The NCAA concussion policy further provided that student-athletes diagnosed with a TBI "shall not return to activity for the remainder of that day" and that the team physician would be required to gauge medical clearance.

80.    Finally, the NCAA concussion policy required students to sign a statement "in which they accept the responsibility for reporting their injuries and illnesses, including signs and symptoms of concussion" to medical staff and noted that student-athletes would be provided with educational materials.

81.     However, this policy, too, is deeply flawed and inadequate: due to the very nature of concussions, student-athletes suffering from TBIs, and the related symptoms, are in no position to medically assess themselves, or to provide informed consent to continue participating in athletics.

82.     As Defendants are aware, the types of questions used to screen student-athletes for TBIs include: "what is your name?"; "what year is it?"; and "what sport are we playing?"  These are the types of questions that student-athletes experiencing TBIs routinely fail to answer correctly.  A student-athlete who cannot state their own name is in no condition to make an informed decision about whether or not to continue participating in athletics, and is entirely dependent on others—including Defendants—to identify TBIs in real-time and take appropriate remedial action.

83.     For an injured student-athlete, Defendants stand in the role of a guardian tasked with making decisions in the student-athlete's best interest.  For decades, Defendants have failed to honor their legal obligations by fulfilling that role and have, instead, acted solely in their own pecuniary interests, all to the life-long detriment of thousands of student-athletes.

84.     These still-deficient policies were implemented far too late.  Plaintiff and the other members of the Class have suffered reasonably foreseeable harm as a result of Defendants' actions.

## IV.     <u>Facts Specific to Plaintiff</u>

85.     Plaintiff Stephen Shaffer was a student-athlete in Capital University's football program, and played three seasons of NCAA Division III football, at various positions, from 1990-1993.  During the dozens of football games and hundreds of

practices that Shaffer participated in as a student-athlete at Capital University, he suffered "repeated blows to the head" that were not properly addressed by the various officials and staff members employed by Defendants.

86. Over time, Shaffer has begun to experience the devastating consequences of the TBIs that he suffered while participating in Capital University's NCAA football program. He has struggled with the symptoms attendant to these neurological disorders, including severe depression, increased irritability and aggression, loss of memory, anxiety, inability to focus, loss of cognitive function, decreased job performance, and diminished impulse control.

87. During the time Shaffer was a student-athlete at Capital University, and through until 2010, Defendants failed to implement any TBI management protocols or policies. Likewise, during that time, Defendants failed to implement any meaningful "return-to-play" guidelines regarding student-athletes suffering from TBIs.

88. While Shaffer was being subjected to severe, repetitive TBIs for the profit and promotion of Defendants, they never informed or educated Shaffer regarding the short-term and long-term health risks associated with TBIs

89. Furthermore, Defendants never instituted appropriate health-and-safety protocols to monitor, manage, and mitigate risks associated with TBIs—throughout the years Plaintiff and the other members of the class were student-athletes at Capital University. Despite being aware of the many cranial blows suffered by Shaffer and the other members of the Class, Defendants took no appropriate ameliorative actions.

90. During the time in which Plaintiff and the other members of the Class were Capital University student-athletes, Defendants ignored the medical evidence and

recommendations of experts regarding TBIs, and failed to protect the health and well-being of its student-athletes who participated in the Capital University football program, including Plaintiff and the other members of the Class.

### CLASS ACTION ALLEGATIONS

91.    Plaintiff brings this action pursuant to Federal Rule of Civil Procedure Rule 23(b)(3) on behalf of himself and a Class defined as follows:

> **Class**:  All individuals who participated in the Capital University varsity football program between 1952 and 2010.

92.    The following people are excluded from the Class: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and its current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

93.    **Numerosity**: The exact number of the members of the Class is unknown and not available to Plaintiff at this time, but it is clear that individual joinder is impracticable.  On information and belief, hundreds of Capital University football players fall into the definition of the Class.  Members of the Class can be identified through Defendants' records.

94.    **Commonality**: There are many questions of law and fact common to the claims of Plaintiff and the Class, and those questions predominate over any questions

that may affect individual members. Common questions for the Class include, but are not limited to the following:

    a.  whether Defendants had a duty to adequately warn and educate Capital University student-athletes, including Plaintiff and the other members of the Class, about the dangers and symptoms of TBIs;

    b.  whether Defendants had a duty to enact rules and procedures to protect Capital University student-athletes, including Plaintiff and the Class, from sustaining TBIs;

    c.  whether Defendants' conduct as alleged herein constitutes and breach of duty;

    d.  whether Defendants' conduct as alleged herein constitutes negligence;

    e.  whether Defendants' conduct as alleged herein constitutes breach of contract;

    f.  whether Defendants' conduct as alleged herein constitutes fraudulent concealment;

    g.  whether Defendants were unjustly enriched at the expense of Plaintiff and the Class; and

    h.  whether Plaintiff and the other members of the Class are entitled to equitable relief, including actual and compensatory damages, and other injunctive relief.

95. **Typicality**: Plaintiff's claims are typical of the claims of the other members of the Class, as Plaintiff and the other members of the Class sustained damages arising out of the wrongful conduct of Defendants based upon the same negligent conduct.

96. **Adequate Representation**: Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel competent and experienced in complex litigation and class actions. Plaintiff has no interest antagonistic to those of the Class, and Defendants have no defenses unique to Plaintiff.

97. **Predominance and Superiority**: Class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy, as joinder of all members is impracticable. The damages suffered by the individual members of the Class are relatively small in comparison to the burden and expense of individual prosecution of the complex litigation necessitated by Defendants' actions. It would be virtually impossible for the members of the Class to obtain effective relief from Defendants' misconduct on an individual basis. Even if members of the Class themselves could sustain such individual litigation, it would not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

**COUNT I:**
**NEGLIGENCE**
(*Individually and on Behalf of the Class as Against All Defendants*)

98. Plaintiff incorporates by reference all of the foregoing allegations and statements.

99. From its inception and by virtue of its role as the governing body in college athletics, Defendant NCAA has historically assumed a duty to protect the health and safety of all student-athletes at its member institutions. The NCAA has also assumed a duty of care by voluntarily taking steps to protect and promote the health and safety of the student-athletes under its purview, including promulgating safety handbooks and

28

regulations. That duty included an obligation to supervise, regulate, and monitor the rules of its governed sports, and to provide appropriate and up-to-date guidance and regulations to minimize the risk of injury to its student-athletes participating in football.

100. Defendants Capital University and the OAC assumed similar duties with respect to Capital University student-athletes, including Plaintiff and the other members of the Class.

101. Defendants' duties included an obligation to supervise, regulate, and monitor the rules of the Capital University football program and provide appropriate and up-to-date guidance and regulations to minimize the risk of long-term and short-term TBIs to Capital University student-athletes.

102. Defendants had an additional duty to educate Capital University student-athletes regarding the proper ways to evaluate and treat TBIs during football games and practices, afterwards, and inform student-athletes of the long-term risks associated with football-related TBIs. The NCAA's duty further subsumed a duty to educate Capital University and the OAC regarding the evaluation and treatment of TBIs, and a duty to warn student-athletes of the immediate dangers of TBIs and the attendant long-term risks of neurocognitive dysfunction.

103. Defendants had a duty not to conceal material information from Capital University student-athletes, including Plaintiff and the other members of the Class.

104. Defendants breached their duties to Plaintiff and the other members of the Class by failing to implement, promulgate, or require appropriate and up-to-date guidelines regarding the evaluation and treatment of TBIs on the playing/practice fields, in locker rooms, and in the days, weeks, and months after Capital University football

29

players sustained TBIs, as well as providing treatment for the latent and long-term effects of TBIs. These failings include, but are not limited to:

    a. failing to recognize and monitor TBIs during football practices and games;

    b. failing to inform student-athletes of the dangers of concussive injuries;

    c. failing to implement appropriate "return-to-play" procedures and regulations for student-athletes who sustained TBIs and/or were suspected of sustaining such injuries;

    d. failing to implement procedures to monitor the health of student-athletes who have sustained (or are suspected of sustaining) TBIs;

    e. failing to inform the extended families of student-athletes regarding TBIs sustained by their family member; and

    f. failing to provide adequate notification, warning, and treatment for the direct and latent neurocognitive and neurobehavioral effects of TBIs, after the time Plaintiff left Capital University.

105. Defendants breached their duties to Plaintiff and the other members of the Class by fraudulently concealing, failing to disclose, failing to recognize, and/or being willfully blind to: (1) material information regarding the long-term risks and effects of repetitive TBIs that Defendants possessed or should have possessed; (2) the dangers of TBIs; and (3) the proper methodologies for Defendants, Defendants' employees and agents, student-athletes, and other related third parties to evaluate, treat, and avoid TBIs.

106. Plaintiff and the other members of the Class relied upon the guidance, expertise, and instruction of Defendants in understanding the risks associated with the serious and life-altering medical issues attendant to TBIs suffered while playing football.

107. At all relevant times, Defendants had superior knowledge of material information regarding the effect of repeated TBIs. Because such information was not

readily available to Plaintiff and the other members of the Class, Defendants knew or should have known that Plaintiff would act and rely upon the guidance, expertise, and instruction of Defendants on these crucial medical issues, while student-athletes at Capital University and thereafter.

108.    Repetitive TBIs during college football practices and games have a pathological and sinisterly latent effect on the brain. Repetitive TBIs cause deformation, twisting, shearing, and stretching of neuronal cells such that multiple forms of damage take place, including the release of small amounts of chemicals within the brain, such as the "tau" protein, which is a signature pathology of the same phenomenon as *dementia pugilistica*—studied and reported by the medical authorities cited above.[21]

109.    Plaintiff and the other members of the Class experienced repetitive TBIs during their college football careers that significantly increased their risk of developing neurodegenerative disorders and diseases, including but not limited to: memory loss, dementia, depression, Chronic Traumatic Encephalopathy ("CTE"), Alzheimer's disease, Parkinson's disease, other neurocognitive disorders/injuries, and related symptoms.

110.    The repetitive head acceleration-deceleration, or "whiplash" hits, to which Plaintiff and the other members of the class were exposed to on a regular basis presented risks of latent and long-term debilitating chronic illnesses.    Absent Defendants' negligence and concealment, the risks of harm to Plaintiff and the other members of the Class would have been materially lower, and they would not have sustained the brain damage from which they currently suffer.

---

[21]    *See*, *e.g.*, *supra* at ¶¶ 37-84.

111.    The repetitive impacts and TBIs Plaintiff and the other members of the Class sustained while playing football at Capital University resulted in neurocognitive and neurobehavioral changes in Plaintiff and the other members of the Class, including neurocognitive disability, decline, and forgetfulness, all of which will have affected the quality of their lives and will require ongoing future medical care.

112.    As a direct and proximate result of Defendants' negligence, Plaintiff and the other members of the Class have incurred damages in the form of permanent brain damage, emotional distress, past and future medical costs, health care, home care expenses, other out-of-pocket expenses, lost time, lost future earnings, and other damages.  Plaintiff and the other members of the Class will likely incur future damages caused by Defendants' negligence.

113.    As a result of their misconduct, Defendants are liable to Plaintiff and the other members of the Class for the full measure of damages allowed under applicable law.  Plaintiff, individually and on behalf of the Class, seeks actual damages for Defendants' negligence, as well as interest, reasonable attorneys' fees, expenses, and costs to the extent allowable.

**COUNT II**:
**FRAUDULENT CONCEALMENT**
(*Individually and on Behalf of the Class as Against All Defendants*)

114.    Plaintiff incorporates by reference all of the foregoing allegations.

115.    Defendants knew that repetitive head impacts in football games and full-contact practices created a substantial and real risk of harm to student-athletes.  This risk of harm is similar or identical to the risks borne by boxers who suffer repetitive impacts to the head during practices and matches, as well at the risk to professional

football players, many of whom have been forced to retire due to TBIs and the resulting neurological injuries and disease.

116. Defendants were aware of and understood the significance of the published medical literature described in the preceding paragraphs of this Class Action Complaint, which detailed the serious risk of short-term and long-term brain injury associated with the repetitive traumatic impacts to the head to which Capital University football players were regularly exposed.

117. Defendants were willfully blind to and/or knowingly concealed from Plaintiff and the other members of the Class the risks of TBIs to student-athletes participating in NCAA football games and practices, including the risks associated with returning to physical activity too soon after sustaining a TBI.

118. By concealing material facts, Defendants intended to induce a false belief under circumstances creating a duty to speak. Defendants intended to induce a false belief that Plaintiff and the other members of the Class that it was safe to continue to participate in the Capital University football program (and that Plaintiff and the other members of the Class should not be prevented from continuing to participate in the football program) after a TBI, or even multiple TBIs, despite the fact such injuries require time and rest to properly heal.

119. Plaintiff and the other members of the Class could not have reasonably been expected to know or discover the truth about the risks associated with TBIs, or were prevented or mislead from obtaining such truthful information. Plaintiff and the other members of the Class were under the care and treatment of Defendants and

justifiably relied on their silence when Defendants had an obligation to disclose the facts concerning the risk of TBIs sustained while participating in football.

120.     Given Defendants' superior and unique vantage point, Plaintiff and the other members of the Class reasonably looked to and relied upon Defendants for guidance on TBIs, including the later-in-life consequences of the repetitive injuries Plaintiff (and many others) sustained while playing NCAA football at Capital University.

121.     This concealed information was such that Plaintiff and the other members of the Class would have acted differently if they had been aware of the material facts known to, and concealed by, Defendants.  Had Plaintiff and the other members of the Class known the full facts in Defendants' possession, they: (1) would not have continued to play football after sustaining a TBI; or (2) would have taken additional time off from participating to allow their injuries to fully heal before returning to play; or (3) would have taken additional precautions while playing football; or (4) would not have continued to play college football at all.  Despite Defendants' knowledge, they failed to act reasonably by developing appropriate guidelines regarding "return-to-play" criteria and other meaningful safety procedures.  Defendants' inaction and concealment greatly increased the risks of long-term injury and illness to their student-athletes, including Plaintiff and the other members of the Class.

122.     As a direct and proximate result of Defendants' knowing concealment and/or willful blindness, Plaintiff and the other members of the Class have suffered, and will continue to suffer, substantial injuries, emotional distress, pain and suffering, and economic and non-economic damages that are ongoing in nature.

123.  As a result of their misconduct, Defendants are liable to Plaintiff and the other members of the Class for the full measure of damages allowed under applicable law.  Plaintiff, individually and on behalf of the Class, seeks actual damages for Defendants' fraudulent concealment, as well as interest, reasonable attorneys' fees, expenses, and costs to the extent allowable.

**COUNT III**:
**BREACH OF EXPRESS CONTRACT**
(*Individually and on Behalf of the Class as Against All Defendants*)

124.  Plaintiff incorporates by reference all of the foregoing allegations.

125.  As a football player at Capital University, an institution whose athletic programs are governed by the NCAA, Plaintiff and the other members of the Class were required to, and did, enter into a contract with the NCAA as a prerequisite to sports participation.  The contract required Plaintiff and the other members of the Class to complete a form affirming that they had read the NCAA regulations and applicable NCAA Division manual, which expressly encompassed the NCAA Constitution, Operating Bylaws, and Administrative Bylaws, and further, that he agreed to abide by NCAA Division bylaws.

126.  In exchange for Plaintiff's and the Class members' agreement, the NCAA, the OAC, and Capital University promised to perform certain services and functions, including, *inter alia*:

    a.  Conducting intercollegiate athletics in a manner designed to protect and enhance the physical and educational welfare of student-athletes;

    b.  Requiring that each member institution protect the health of, and provide a safe environment for, each of its participating student-athletes; and

35

c. Requiring that each member institution must establish and maintain an environment in which a student-athlete's activities are conducted as an integral part of the student-athlete's educational experience.

127.   By signing and agreeing to abide by NCAA regulations, and thereafter participating in a NCAA-sanctioned sports program in accordance with such regulations, Plaintiff and the other members of the Class fulfilled their contractual obligations to Defendants.

128.   As described in the foregoing allegations, Defendants breached the Parties' agreement by failing to ensure that Capital Universit student-athletes were provided with a safe environment in which to participate in NCAA athletics.  Defendants further breached the contract by concealing and/or failing to properly educate and warn players about the symptoms and long-term risks of TBIs.

129.   Plaintiff entered into a written agreement with the NCAA in which he committed to play football at Capital University (under the auspices of the OAC), to attend Capital University as a student, and to comply with all applicable codes of conduct and obligations as both a football player and student at Capital University.

130.   That contract required Defendants to fulfill their obligations to Plaintiff and the other members of the Class, and those obligations included:

a. To conduct their football program in a manner designed to protect and enhance the physical and educational well-being of its student-athletes, including Plaintiff and the other members of the Class; and

b. To furnish a safe environment for all of its football program's participants.

131.   Plaintiff and the other members of the Class fulfilled their contractual obligations.

132.    Defendants' contractual breaches caused Plaintiff and the other members of the Class to suffer physical injury and damages in the form of past, ongoing, and future medical expenses.

133.    As a result of its misconduct, Defendants are liable to Plaintiff and the other members of the class for the full measure of damages allowed under applicable law.   Plaintiff, individually and on behalf of all members of the Class, seeks actual damages for Defendants' contractual breaches, as well as interest, reasonable attorneys' fees, expenses, and costs to the extent allowable.

### COUNT IV:
### BREACH OF IMPLIED CONTRACT
### (_Individually and on Behalf of the Class as Against All Defendants_)

134.    Plaintiff incorporates by reference all of the foregoing allegations.

135.    To the extent that an express written contract cannot be established among Plaintiff, the Class, and Defendants, the foregoing recitation of facts and discussion support the finding of an implied contract.

136.    Under this implied contract, Plaintiff and the other members of the Class agreed to submit and be bound by NCAA regulations as a prerequisite to sports participation at Capital University.   One condition of this implied contract, amongst many others, required that the NCAA abide by its own Constitution and Bylaws (as described above), which were to be implemented by Capital University and the OAC.

137.    Likewise, between the years of 1952 and 2010, Plaintiff and the other members of the Class agreed to be bound by the rules and regulations set forth by Defendants in exchange for participating in the Capital University athletic programs controlled and administered by the Defendants (including varsity football).   One

37

condition of this implied contract, amongst many others, required that Defendants abide by the NCAA Constitution and related documents (as described above), including any additional regulations promulgated by Capital University and the OAC.

138. In exchange for Plaintiff's and the Class members' implicit agreement, Defendants promised to perform certain services and functions, including, *inter alia*:

    a. Conducting intercollegiate athletics in a manner designed to protect and enhance the physical and educational welfare of student-athletes;

    b. Requiring that each member institution protect the health of, and provide a safe environment for, each of its participating student-athletes; and

    c. Requiring that each member institution must establish and maintain an environment in which a student-athlete's activities are conducted as an integral part of the student-athlete's educational experience.

139. By agreeing to abide by NCAA regulations, and thereafter participating in a NCAA-sanctioned sports program in accordance with all such regulations, Plaintiff and the other members of the Class fulfilled their contractual obligations to Defendants.

140. As described in the foregoing allegations, Defendants breached this implied contractual agreement by failing to ensure that its student-athletes were provided with a safe environment in which to participate in their NCAA sport activities. Defendants further breached these contracts by concealing and/or failing to properly educate and warn student-athletes about the symptoms and long-term risks associated with TBIs.

141. This implied contract required that Defendants fulfill their obligations to Plaintiff, and those obligations included that:

    a. To conduct their football programs in a manner designed to protect and enhance the physical and educational well-being of its student-athletes, including Plaintiff and the other members of the Class; and

b. To furnish a safe environment for student-athletes.

142. Plaintiff and the other members of the class fulfilled their obligations under the contract.

143. Defendants' contractual breaches caused Plaintiff and the other members of the Class to suffer physical injury and damages in the form of past, ongoing, and future medical expenses.

144. As a result of its misconduct, Defendants are liable to Plaintiff for the full measure of damages allowed under applicable law. Plaintiff, individually and on behalf of all members of the Class, seeks actual damages for Defendants' contractual breaches, as well as interest, reasonable attorneys' fees, expenses, and costs to the extent allowable.

**COUNT V**:
**BREACH OF EXPRESS CONTRACT**
(*Individually and on Behalf of the Class as Third-Party Beneficiaries as Against All Defendants*)

145. Plaintiff incorporates by reference all of the foregoing allegations.

146. To the extent that no express or implied contract is found to exist between Plaintiff and Defendants, an express contract existed between the NCAA, the OAC, and Capital University. Under the terms of that contract, Defendants agreed to abide by the applicable NCAA rules and regulations, including those expressly set forth in the NCAA's Division Manuals, Constitution, and Bylaws.

147. Under the terms of that contract, which, upon information and belief, are substantially similar to the terms set forth in the NCAA Constitution and encompassed within the NCAA Division Manuals, Defendants agreed to, among other things: (1)

conduct intercollegiate athletic programs in a manner designed to protect and enhance the physical and educational well-being of student-athletes; and (2) protect the health of, and provide a safe environment for, each of its participating student-athletes.

148.    Plaintiff and the other members of the Class are the intended third-party beneficiaries of the contract amongst Defendants. Such an intention can be found in the express language of the NCAA's rules and regulations, as well as the stated purpose and principles of the NCAA.

149.    Defendants breached the contractual duties owed to Plaintiff and the other members of the Class under that contract by: (1) failing to implement or require guidelines and "return-to-play" criteria to minimize or prevent the risk of TBIs; and (2) failing to adequately inform and educate Capital University football players regarding the symptoms and long-term dangers of TBIs.

150.    As a direct result of the NCAA's breach, Plaintiff and the other members of the Class suffered physical injury and damages in the form of past, ongoing, and future medical expenses, and other out of pocket expenses, lost time, lost future earnings, and other damages. Further, Plaintiff and the other members of the Class will likely incur future damages caused by the NCAA's conduct.

151.    As a result of their misconduct, the NCAA are liable to Plaintiff for the full measure of damages allowed under applicable law. Plaintiff, individually and on behalf of the Class, seeks actual damages for NCAA's contractual breaches, as well as interest, reasonable attorneys' fees, expenses, and costs to the extent allowable.

**COUNT VI**:
**UNJUST ENRICHMENT**
(*In the Alternative to Breach of Contract Counts*)
(*Individually and on Behalf of the Class as Against All Defendants*)

152.     Plaintiff incorporates by reference all of the foregoing allegations, excluding paragraphs 124-151.

153.     Defendants receive significant revenues from the collegiate football played by student-athletes.   These revenues include, but are not limited to, contractual revenues from broadcasting, merchandising agreements, and ticket sales.

154.     Defendants appreciate and have knowledge of such benefits.

155.     Under principles of equity and good conscience, Defendants should not be permitted to retain the profits they received at the expense of Plaintiff and the other members of the Class while refusing to pay for medical expenses incurred as a result of their unlawful actions or otherwise failing to prevent such injuries.

156.     Plaintiff, individually and on behalf of the Class, seeks restitution and/or disgorgement of all monies Defendants have unjustly received as a result of their conduct alleged herein.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Stephen Shaffer, individually and on behalf of the Class, requests that the Court enter an Order providing for the following relief:

    A.  Certify this case as a class action on behalf of the Class defined above, appoint Plaintiff as Class Representative, and appoint his counsel as Class Counsel;

    B.  Declare that Defendants' actions, as set out above, constitute negligence, fraudulent concealment, breach of contract, and unjust enrichment;

    C.  Award all economic, monetary, actual, consequential, compensatory, and punitive damages caused by Defendants' conduct, including without

limitation damages for past, present, and future medical expenses, other out-of-pocket expenses, lost time and interest, lost future earnings, and other damages. Further, Plaintiff and the Class will likely incur future damages caused by Defendants' misconduct;

D. Award Plaintiff and the Class their reasonable litigation expenses and attorneys' fees;

E. Award Plaintiff and the Class pre- and post-judgment interest, to the extent allowable;

F. Enter injunctive and/or declaratory relief as is necessary to protect the interests of Plaintiff and the Class; and

G. Award such other and further relief as equity and justice may require.

## **JURY DEMAND**

Plaintiff demands a trial by jury for all issues so triable.

Respectfully submitted,

**STEPHEN SHAFFER**, individually and behalf of all others similarly situated.


  /s/ Robert T. Dassow
ROBERT T. DASSOW, ESQUIRE
HOVDE DASSOW & DEETS
10201 N. ILLINOIS STREET, SUITE 500
INDIANAPOLIS, INDIANA 46290
PHONE: (317) 818-3100
FAX: (317) 818-3111
RDASSOW@HOVDELAW.COM

SOL H. WEISS, ESQUIRE (NO. 15925)
DAVID S. SENOFF, ESQUIRE (NO. 65278)
ONE LOGAN SQUARE
130 N. 18TH STREET, SUITE 1600
PHILADELPHIA, PA 19103
PHONE: (215) 790-4550
FAX: (215) 875-7733
SWEISS@ANAPOLWEISS.COM
DSENOFF@ANAPOLWEISS.COM

*ATTORNEYS FOR PLAINTIFF AND THE CLASS*

DATE: October 6, 2016